**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| A.H., a minor, by his father and next friend, KEITH HOLZMUELLER, | ) ) ) | |
| Plaintiff, | ) ) | No. 16-CV-1959 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| ILLINOIS HIGH SCHOOL ASSOCIATION, | ) ) ) | |
| Defendant. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff A.H. is a high school runner with cerebral palsy. Although he competes as a member of his school's track team during the regular season, he has sued the Illinois High School Association ("IHSA"), which runs the state track and field championship and other events, seeking two accommodations for his disability: that IHSA establish realistic qualifying times for para-ambulatory athletes to compete in the state finals and that IHSA establish a para-ambulatory division in its annual 5K "Road Race" event. IHSA has moved for summary judgment. Although there are some preliminary issues to address, the principal dispute between the parties is whether A.H.'s requested accommodations are reasonable. The reasonableness of accommodations for disabilities is often a fact question, but here the question can be resolved as a matter of law, both because there is no evidence from which to infer that A.H. could meet the required performance standards were he not disabled and because a public entity need not lower its qualifying standards to facilitate participation by the disabled. His related claim that IHSA's denial of his accommodation requests deprived him of equal protection also fails because IHSA's position is rational, not arbitrary, and is not the product of discriminatory animus.

Accordingly, and as more fully set forth below, IHSA is (with one minor exception) entitled to summary judgment.

## BACKGROUND

On summary judgment, the Court "must construe all facts and reasonable inferences in favor of the nonmoving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016), *cert. denied sub nom. Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 137 S. Ct. 310 (2016). Only IHSA has moved for summary judgment so all facts are interpreted, and all inferences drawn, in A.H.'s favor. The facts summarized below are undisputed unless otherwise noted. The Court did not consider the portions of the expert report deemed inadmissible later in this opinion. *See Poulter v. Cottrell, Inc.*, 50 F. Supp. 3d 953, 955 (N.D. Ill. 2014).

Plaintiff A.H. is a high school student at Evanston Township High School in Evanston, Illinois. Def.'s Statement of Material Facts ("DSOF") ¶ 1, ECF No. 156. Since his freshman year, A.H. has been a member of his school's swim, track, and cross-country teams. *Id.* at ¶ 89. During his three years of high school, A.H. has missed fewer than five track and cross-country practices and has never missed a meet. *Id.* at ¶ 90. A.H.'s coach has made him feel welcome "to the best of [his] ability" and A.H. is accepted and respected by his teammates and coaches. *Id.* at ¶ 94-95. A.H. has received awards for his leadership and determination from his track coach. *Id.* at ¶ 100.

A.H.'s athletic participation is noteworthy in light of the fact that he has physical disabilities, including spastic quadriplegia related to cerebral palsy. Pl.'s Statement of Additional Facts ("PSOF") ¶ 1, ECF No. 168. Due to his disabilities, A.H. has a limited range of motion in his hips, knees, and ankles as well as an abnormal gait pattern and involuntary movement. *Id.* at

¶¶ 2-4. These disabilities adversely affect the basic mechanics of running, which require an athlete to balance, flex, extend, and propel his body by coordinating the movements of all four limbs. *Id*. For example, A.H. cannot push off on his toes in the way that an able-bodied runner would. *Id*. at ¶ 5.

In addition to competing on the high school track team, A.H. frequently participates in adaptive sports against other individuals with disabilities. DSOF ¶ 116. A.H. competes both locally and nationally in these competitions, including the 2016 U.S. Paralympic Trials. *Id*.; PSOF ¶ 9. Within the disabled athletic community, A.H. is seen as an "elite" and "up and coming" athlete who may well compete internationally in the future. PSOF ¶¶ 8, 10.

Despite these achievements, A.H. has never been able to compete in the state finals for track, a competition sponsored and managed by defendant IHSA.[1] *Id*. at ¶ 6. IHSA does not offer a division for athletes with disabilities in track unless they use a wheelchair. *Id*. at ¶ 20. In contrast, IHSA allows both wheelchair athletes and para-ambulatory athletes (including A.H.) to compete in a disability division in swimming. *Id*. Disabled swimmers and wheelchair track participants are able to earn points for their teams that contribute to a "Combined State Championship" award (which is open only to schools which have disabled athletes competing). *Id*. at ¶ 19.

Selected by his coach, A.H. ran the 1600 meter race at the spring 2017 sectional competition (which is a qualifying race for the state championship) against able-bodied athletes,

---

[1] The IHSA Track and Field State Series involves a two-stage process by which each school submits up to two athletes for each event in the "sectional" tournament. DSOF ¶ 39-40. To advance to the state finals, a student must place first or second in the sectional or meet a qualifying time. *Id*. at ¶ 45. This process is designed to ensure that only the top ten percent or less of all high school athletes participate in the state finals. *Id*. at ¶ 46. Only the top nine athletes in each event at state are awarded medals, approximately five percent of all athletes that participate during the regular season. *Id*. at ¶ 51. IHSA does not control the regular season meets, which are conducted by member schools. *Id*. at ¶ 37.

but he did not run fast enough to qualify for the state finals according to the metrics used for able-bodied runners. DSOF ¶¶ 112, 113. A.H. finished last in that race, almost a minute and a half behind the next fastest runner. PSOF ¶ 12. It is undisputed that even the world record holders for runners with A.H.'s disability classification would not meet IHSA's qualifying times to compete at the state track meet. *Id*. at ¶ 18.

On or about September 26, 2015, A.H. made three requests to IHSA regarding its track program: 1) that he be allowed to use a modified starting block, 2) that IHSA create qualifying time standards[2] for para-ambulatory athletes for the state finals,[3] and 3) that IHSA create a para-ambulatory division in the annual Road Race[4] event.[5] DSOF ¶ 62. Only the latter two requests are at issue in this case, because IHSA's Executive Director granted the request permitting A.H. to use a modified starting block. *Id*. at ¶ 66. On October 8, 2015, IHSA's Executive Director (Dr. Hickman) denied A.H.'s request for different time standards and the new para-ambulatory division. *Id*.

---

[2] IHSA already has different time standards for boys and girls, wheelchair athletes, and students from schools of different types and sizes. PSOF ¶ 15-16.

[3] The request for different time standards only sought new standards for the 100, 200, 400, and 800 meter races. *See* DSOF Ex. 4 at 1.

[4] The Road Race is an annual five kilometer race in which high school athletes from across the state can compete. *See* Minutes from the Athletes with Disabilities Advisory Comm. Mtg., ECF No. 171-16 at 29. It appears any high school athlete can register for the Road Race (*i.e.,* there are no qualifying times), but A.H. did not register for the 2017 Road Race event because his request for an accommodation had been denied. *See* Def.'s Supp. to Statement of Facts ¶ 120, ECF No. 166 Ex. 1; Pl.'s Mem. at 7; Pl.'s Resp. to DSOF ¶ 75. The top five finishers in the Road Race earn medals. *See* Def.'s Mem. at 11; Pl.'s Ex. 21 at 30.

[5] According to the request, para-ambulatory runners could start with able-bodied runners but the top five para-ambulatory runners would win awards regardless of how their times compared to able-bodied runners. *See* DSOF Ex. 6 at 1.

A few words are necessary at this point about IHSA. IHSA is a not-for-profit[6] which organizes interscholastic athletic events throughout the state for high school students. DSOF ¶¶ 2, 4. Illinois high schools that meet the criteria of IHSA membership may elect to join IHSA as long as they follow its terms and conditions, bylaws, and constitution. *Id*. at ¶ 8. Over 90% of Illinois high schools are members of IHSA. PSOF ¶ 13. IHSA's board comprises 10 principals from member schools. DSOF ¶ 9. IHSA's Executive Director has the authority to decide "all matters concerning eligibility, accommodation requests . . . and make modifications or impose penalties where appropriate." *Id*. at ¶ 22. IHSA does not have a template or published set of criteria for adjudicating accommodation requests. *Id*. at ¶ 24. A dissatisfied party may appeal the Executive Director's action to the IHSA Board, which will hold a hearing and then decide whether to affirm or alter the Executive Director's decision. DSOF ¶ 26-27.

On October 25, 2015, A.H. appealed the denial of his accommodation requests to the IHSA Board, which scheduled a hearing for December 14, 2015. DSOF ¶ 76. After the hearing, the Board affirmed the Executive Director's decision, reasoning that A.H. was already participating in his school's track team and that he had the opportunity to participate even if he was unlikely to win. *Id*. at ¶ 77-79. Individual board members expressed that granting A.H.'s requested accommodations would give him an unfair competitive advantage compared to able-bodied students because he would have a greater opportunity to advance to state from the sectional competition given the much smaller number of competitors he would face. *See id*. at ¶ 84. Following the Board's denial of his appeal, A.H. filed this suit on February 4, 2016. IHSA has moved for summary judgment on all counts and moved to bar A.H.'s expert.

---

[6] IHSA's exact structure (unincorporated association or 501(c)(3) organization) is a matter of dispute between the parties. *Compare* DSOF ¶ 2 *and* Pl.'s Resp. to DSOF ¶ 2. Resolution of the dispute, however, is not material to the outcome of IHSA's motion.

**DISCUSSION**

A.H. brings claims for injunctive relief under Section 504(a) of the Rehabilitation Act (29 U.S.C. § 794(a)), Title II of the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12132), Title III of the ADA (42 U.S.C. § 12182(a)), and the Equal Protection Clauses of the Illinois and federal constitutions. IHSA has moved for summary judgment on the various claims and additionally moved to bar A.H.'s expert's testimony. Summary judgment, of course, is only appropriate if the moving party (IHSA) shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The Court addresses the *Daubert* motion first, so that what constitutes the record on summary judgment is clear, and then addresses IHSA's arguments for summary judgment.[7]

**I. *Daubert* Challenge**

IHSA moves to bar the testimony of Keri Serota, A.H.'s expert, under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The admissibility of Serota's opinions is largely academic in view of the Court's conclusion that the antidiscrimination statutes do not require IHSA to provide the principal accommodations A.H. seeks, but not entirely. Serota has offered opinions bearing on safety accommodations in connection with the Road Race. As discussed *infra*, the grant of summary judgment in IHSA's favor does not extend to the question of those

---

[7] In his opposition brief, A.H. repeatedly asserts that summary judgment "could" be denied because the Court "terminated" IHSA's memorandum in support of its motion. *See, e.g.*, Resp. at 3 n.1, ECF 167. This assertion reflects a misunderstanding of the Court's docket entry 165, which directed the Clerk's office "to terminate the pending 'motions' at [155] and [164] as these are memoranda in support and not motions." The purpose of the docket entry was simply to correct the misdesignation on the docket of the supporting briefs as pending motions; only the motions themselves should have been designated as pending. This correction was purely clerical in nature and had no effect on the filed briefs; they were not stricken and did not need to be refiled.

modifications and Serota's opinions on that question remain relevant. Accordingly, IHSA's *Daubert* challenge to Serota's opinions must still be addressed.[8]

Under Rule 702, this Court allows testimony of an expert witness whose "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" if the expert's testimony is based on sufficient facts or data and is the product of reliable principles and methods which were reliably applied. *See* Fed. R. Evid. 702. The Court's gatekeeping function applies to both scientific explanations as well as "skill- or experience-based observation." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). Here, IHSA raises two arguments why Serota's opinions should not be considered: that she lacks adequate knowledge of the facts of this case, and that Serota's methodology is unreliable because she failed to explain how she reached her conclusions.

As an initial matter, it bears noting that IHSA does not dispute that Ms. Serota is qualified by her experience to issue opinions in this sort of case. She has a master's degree in "adapted physical education" as well as a bachelor's degree in kinesiology and physical education teaching (all from Indiana University). *See* Serota C.V., ECF No. 164 Ex. 1 at 46. She has worked in adaptive sports (that is to say, sports for people with disabilities) since August 2004. *Id*. at 46-47. She currently coordinates accommodations for disabled athletes in the Chicago Marathon and trains disabled athletes through the first USA Triathlon-sanctioned Paratriathlon Club. *Id*. at 46. In her previous position, she planned events for para-ambulatory

---

[8] A.H. initially argued that this Court need not decide the current *Daubert* motion because the trial scheduled in this case is a bench trial, and the Court may hear all the evidence in a bench trial and then determine what is admissible. *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). The Court agrees to the extent that it will continue to evaluate the admissibility any of Ms. Serota's opinions that are presented at trial. It is appropriate, however, for the Court to evaluate which portions of the summary judgment record are admissible and rely only on those portions in assessing the summary judgment motion. *Cf. Poulter v. Cottrell, Inc.,* 50 F. Supp. 3d 953, 955 (N.D. Ill. 2014).

athletes as the Program Director for the Great Lakes Adaptive Sports Association. *Id*. She has also previously served as an expert witness in a similar case against IHSA. *Id*. Thus, the Court finds that Serota is qualified by her experience as an expert in adaptive sports and sports accommodations and that her testimony might assist the Court in determining the reasonableness of A.H.'s requested accommodations. *See Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) ("Essentially, the district court must make the following inquiries before admitting expert testimony: First, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case").

IHSA's first challenge, based on Rule 702(b)'s requirement that an expert rely on "sufficient facts or data" is clearly misguided. IHSA is certainly correct that an expert must rely on more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. As other courts have noted, the "sufficient facts or data" requirement is a somewhat Gordian one – an expert must "take into account all of those facts which are necessary to support [her] findings, not just some of them, and [she] cannot conveniently disregard contrary evidence," but a party "cannot disqualify the other side's expert simply by disputing the facts upon which [she] relied." *Jerid Enterprises, LLC v. Lloyd's London*, No. 3:10-CV-435 JD, 2012 WL 6115673, at *4 (N.D. Ind. Dec. 10, 2012); *see also United States v. Scott*, No. 3:11-CR-104 JD, 2013 WL 252247, at *4 (N.D. Ind. Jan. 23, 2013).

Here, Serota relied on a large and diverse array of information. Her report contains over 15 pages of detailed factual allegations with citations to depositions and other materials. Serota cited 113 documents that she considered while formulating the report, including the complaint, the audio file of A.H.'s accommodation hearing, various IHSA policies and meeting minutes,

and a dozen depositions. *See* List of Materials Consulted, ECF No. 164-2 at 101-104. IHSA objects that Serota testified that she considered the para-ambulatory world record time rather than A.H.'s personal race times in forming her opinions, but this is clearly a mere dispute over the facts on which she should have relied (also, given that there is no contention A.H. can run faster than the world record holder, it doesn't matter which time Serota used to demonstrate the existing qualifying times are very unlikely to be met by an athlete with A.H.'s disability). Similarly, IHSA points to a number of occasions in Serota's deposition when she acknowledged that she is not an attorney and was not knowledgeable regarding the relationship between Title II of the ADA and the Rehabilitation Act or what title of the ADA was at issue. Serota isn't a lawyer, and it would not have been proper for her to opine on legal issues even if she were. The facts necessary for her opinions are those about A.H.'s physical ability to compete in high school track events, the accommodations he requested, and IHSA's decision. Tellingly, IHSA does not argue Serota ignored or failed to consult relevant facts about those issues. Thus, the Court finds Serota has considered sufficient facts in forming her opinions.

Next, IHSA alleges that Serota failed to provide any sort of analysis for her opinions. The Court need not accept Serota's conclusions *ipse dixit* – rather, she must explain how the facts considered relate to her conclusion. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005). Serota summarized her opinions as that it is "irrational and unreasonable" for IHSA to not provide para-ambulatory athletes with separate time standards, opportunities to earn points, and a separate Road Race division. *See* Serota Report ¶ 12, ECF No. 164-1. She further opined that it would be a reasonable accommodation for IHSA to provide those opportunities. *Id*. at ¶ 13. Courts in this circuit have been unclear on whether an expert can testify as to the reasonableness of an accommodation under the ADA. *Compare Fliss v. Movado Grp.*,

*Inc.*, No. 98 C 3383, 2000 WL 1154633, at *8 (N.D. Ill. Aug. 14, 2000) (allowing expert testimony by rehabilitation expert that plaintiff could have performed essential job functions with reasonable accommodation acceptable) *with Walters v. Mayo Clinic Health Sys.-Eau Claire Hosp., Inc.*, No. 12-CV-804-WMC, 2014 WL 972959, at *5 (W.D. Wis. Mar. 12, 2014) (barring expert testimony where expert "lacks specialized knowledge as to how an employer would use the information in the form to determine a reasonable accommodation").

In isolation, many of Serota's comments seem unsupported. For example, Serota described the IHSA Executive Director's testimony that creating separate time standards for athletes with physical disabilities would "hurt those athletes" and then simply noted "I disagree with these positions." Serota Report ¶ 77. Read alone, these sort of statements lack any of the methodological or experiential foundation required to be admissible under *Daubert*. On the other hand, Serota does provide analysis for other opinions. For example, Serota opined that "there are likely many non-wheelchair students with physical disabilities who are not involved in track because they are intimidated by the prospect of competing against able-bodied athletes" and then analogized to her experience of increased attendance among disabled swimmers once separate time standards were implemented. *See id.* at ¶ 98. Similarly, in discussing the time standards, Serota analyzed a variety of systems used by other states and programs in order to explain how qualifying standards for disabled athletes could be implemented. *See id.* at ¶ 111-114. She further explained, based on her experience with the Chicago Marathon, how and why a separate division could be implemented at the Road Race. *See id.* at ¶ 132-134.

"Expert testimony may not consist of nothing more that the "bottom line" supported solely by the witness's status as an expert." *Poulter v. Cottrell, Inc.*, No. 12 C 01071, 2014 WL 5293595, at *4 (N.D. Ill. June 24, 2014) (*citing Metavante Corp. v. Emigrant Sav. Bank,* 619

F.3d 748 (7th Cir. 2010)). Here, Serota repeatedly stated that she believes IHSA's actions were "unfair," "unreasonable," and "irrational." *See, e.g.,* Serota Report ¶ 91. These are not proper topics for Serota to opine, especially as she has acknowledged she is not a lawyer or an expert on the ADA. She is, however, entitled to discuss whether the proposed accommodations were feasible and how they could be implemented based on her experience and research. Serota's profession is adapting sporting events to the needs of persons with disabilities and her insights into how other sports and states have implemented similar programs is useful to the Court. Therefore, the motion to bar Serota's testimony is granted in part and denied in part. In short: she may offer opinions about the feasibility of the accommodations that A.H. requested (as discussed further below, only the Road Race will be at issue) and the safety concerns regarding the Road Race, but her opinions about the legal reasonableness, fairness, or rationality of IHSA's denials of the requested accommodations will not be considered.

## II. Case or Controversy

Initially, IHSA argues that there is no longer any case or controversy because A.H. competed in the spring 2017 1600 meter race at an IHSA sectional meet and A.H. did not register for the 2017 Road Race and there is "no evidence that A.H. intends to actually participate" in the Road Race. Def.'s Mem. at 6, ECF No. 155. This is, frankly, a silly argument that fundamentally misconstrues the nature of A.H.'s claim. A case is moot only if "a court's decision can no longer affect the rights of litigants in the case before them and simply would be an opinion advising what the law would be upon a hypothetical state of facts." *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) (internal quotation marks omitted). A defendant "carries a heavy burden when it argues that a plaintiff's claims are moot" and a plaintiff's statement that he intends to engage in an activity again can be sufficient.

*Edwards v. Ill. Bd. of Admissions*, 261 F.3d 723, 728 (7th Cir. 2001). Here, A.H.'s lawyers represented that he would like to compete in the 2018 Road Race, and that he did not compete in the 2017 Road Race (which occurred after briefing in this motion was complete) because of safety concerns that would be addressed by his proposed accommodation. *See* Pl.'s Resp. at 13, ECF No. 167; Serota Report ¶ 132 (opining Road Race is unsafe when disabled and non-disabled runners grouped together). Further, A.H.'s performance in the 1600 meter *sectional* race, for which there is no qualifying time and for which the school, not IHSA, determines who may run in each event, does not address his request for different qualifying times for the *state finals*. Most importantly, A.H. will be a senior this coming fall and will have one more opportunity to qualify for the state finals and participate in the Road Race independent of the outcome of the 2017 races. Thus, a decision in this litigation will still impact his rights for this coming athletic season. The case is not moot.[9]

### III. Applicability of Title II and State Actor Status Under § 1983

IHSA maintains that it is a private, rather than public, organization and as such is subject to liability under neither Title II of the ADA nor Section 1983.[10] With respect to the ADA, IHSA argues that it should not be subjected to Title II of the ADA because it is not a "public entity." *See* 42 U.S.C. § 12132. A "public entity" is defined to include "any department, agency, special

---

[9] To the extent that IHSA means to argue that A.H.'s claims related only to the 2016 or 2017 athletic seasons (and there is no evidence they do; from the beginning, this case has been managed so that a ruling on the merits would be made before A.H. began his senior year), this case would be subject to the exception for "capable of repetition, yet evading review" in otherwise moot cases. *See Honig v. Doe*, 484 U.S. 305, 318 (1988).

[10] IHSA does not seek summary judgment on the applicability of Title III of the ADA, which applies to any "place of public accommodation," or that of the Rehabilitation Act, which requires receipt of federal funds. And since the discrimination analysis under Title III and the Rehabilitation Act is substantively the same as the analysis under Title II, the parties' debate about whether IHSA constitutes a public entity under Title II or a state actor under § 1983 is largely academic; dismissal of the Title II and § 1983 counts would not change the substantive legal analysis that applies to A.H.'s claims.

purpose district, or other instrumentality of a State or local government." 42 U.S.C. § 12131(1)(b). Neither the Seventh Circuit nor the United States Supreme Court has defined what it means to be an "instrumentality" of a state or local government. Although the Seventh Circuit has not addressed the application of Title II to a high school athletic association,[11] it has held that IHSA is a state actor for the purposes of 42 U.S.C. § 1983. *See Griffin High School v. Illinois High School Asso.*, 822 F.2d 671, 674 (7th Cir. 1987). As discussed further below, *Griffin* is binding precedent on that point; on the closely analogous question of whether IHSA is a "public entity" under Title II, it is highly persuasive and the Court is not free to disregard it in

---

[11] In *Washington v. Indiana High Sch. Ath. Ass'n*, 181 F.3d 840 (7th Cir. 1999), the Court affirmed the grant of a preliminary injunction against the Indiana High School Athletic Association under Title II, but the question of the applicability of Title II to that association was not addressed in the opinion. Accordingly, that case cannot be considered binding authority for the proposition that Title II applies to high school athletic associations. *Ner Tamid Congregation of N. Town v. Krivoruchko*, 660 F. Supp. 2d 927, 930 (N.D. Ill. 2009) ("prior cases have precedential value only when there has been a deliberative consideration of the issue at hand; sub-silentio or assumptive resolution is not enough. *See e.g.*, *City of Kenosha v. Bruno*, 412 U.S. 507, 512–13 (1973); *Petrov v. Gonzales*, 464 F.3d 800, 802 (7th Cir. 2006); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1090 (3d Cir. 1976); *United States v. Bohle*, 445 F.2d 54, 65 (7th Cir. 1971).").

It appears, however, that the substantial majority of courts that have addressed the matter have concluded that the private athletic associations at issue were public entities. *See, e.g., Rhodes v. Ohio High Sch. Ath. Ass'n*, 939 F. Supp. 584, 591 (N.D. Ohio 1996) ("The evidence tends to show that Ohio has delegated a substantial amount of state authority to the OHSAA: the great majority of OHSAA's members are public schools, it frequently uses public facilities, and it exercises the ability to sanction public schools for violations of its rules. The OHSAA is thus an instrument of the State and a "public entity" amenable to suit pursuant to Section 12132."); *Isler v. N.M. Activities Ass'n*, 893 F. Supp. 2d 1145, 1155 (D.N.M. 2012) (collecting cases); *Steines v. Ohio High Sch. Ath. Ass'n*, 68 F. Supp. 3d 768, 776 (S.D. Ohio 2014). The Court also notes that the prevailing view of courts, as reported in the professional literature, is that Title II applies to high school athletic associations. *See, e.g.,* James Looby, *Reasonable Accommodations for High School Athletes with Disabilities: Preserving Sports While Providing Access for All*, 19 SPORTS L. J. 227, 234 (2012); Andrew I. Warden, Comment, *Driving the Green: The Impact of* PGA Tour, Inc. v. Martin *on Disabled Athletes and the Future of Competitive Sports,* 80 N.C. L. REV. 643, 658-59 (2002); Jonathan R. Cook, *The Americans with Disabilities Act and Its Application to High School, Collegiate and Professional Athletics*, 6. VILL. SPORTS & ENT. L. J. 243, 247 (1999).

the absence of some principled distinction between the two inquiries (Title II public entity vs. § 1983 state actor). IHSA has identified no such distinction.

The facts in this case support treatment of IHSA as both a public entity under Title II and a state actor under § 1983. Consistent with the Seventh Circuit's observation in *Griffin* concerning the "overwhelmingly public character" of the IHSA, the Court notes that the parties agree that 90% of Illinois high schools belong to IHSA, PSOF ¶ 13, and the IHSA board is drawn exclusively from the principals of those schools. DSOF ¶ 9. While local schools (including public schools) run the "[r]egular season contests," IHSA picks up where they leave off and controls the state-wide final tournament and associated events like the Road Race. *See* DSOF ¶¶ 37, 39, 40, 46. Moreover, IHSA exercises substantial indirect control over even regular season events by virtue of its membership requirements. To be a member of IHSA, a school must compete only against other member schools (or schools otherwise allowed by IHSA), hold interscholastic events during dedicated hours, hire coaches that meet IHSA's requirements, use an IHSA-licensed official during competitions, practice only during the prescribed season, attend rules interpretation meetings, keep students' physical examinations on file, and travel out of state only twice per year and only for no more than two school days at a time. *See* Def.'s Ex. 14 at 31-39. Further, at least some IHSA events are held at public schools. *Id.* at ¶ 4. The parties dispute how much money IHSA receives from its public school members, but IHSA controls what revenues the schools collect at events and retains the ability to impose dues and fines on schools.[12]

---

[12] The IHSA bylaws require a public school member "pays dues as required in this Constitution." *See* Def.'s Ex. 14 at 16. IHSA's representatives testified at deposition that they receive revenue from "officials registrations," a fee-sharing arrangement in which local schools collect gate receipts and split them with the organization, and fines for actions such as late withdrawals. IHSA Dep. 23:8-30:20 (Aug. 12, 2016), Def.'s Ex. 19. IHSA sets the prices for the

The cases on which IHSA relies with respect to "public entity" status are readily distinguished and non-controlling in any event. In *K.L. v. Missouri State High School Activities Association* ("*Ladlie*"), a case on which IHSA relies heavily, the district court found that the *board* of the MSHSAA was not a proper "public entity" because it is not a legal "entity" at all. 178 F. Supp. 3d 792, 808 (E.D. Mo. 2016). A.H. has sued the organization, not the Board, and there is no argument that IHSA is not a suable entity.

IHSA points the Court to the Illinois Supreme Court's recent decision finding that IHSA is not a "public body" under Illinois's FOIA law. Illinois's definition of "public body" is quite different from the definition of "public entity" under the ADA. A "public body" under Illinois FOIA is defined as "all legislative, executive, administrative, or advisory bodies of the State, state universities and colleges, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees, or commissions of this State, any subsidiary bodies of any of the foregoing including but not limited to committees and subcommittees." 5 ILCS 140/2. It should be immediately apparently that the Illinois FOIA statute lacks any term similar to the "instrumentality" provision found in the ADA. Furthermore, while the Illinois Supreme Court found IHSA was not a public body, it has specifically and appropriately noted that its interpretation of an Illinois state statute does not control the question of whether federal civil rights statutes apply to IHSA. *Better Gov't Ass'n v. Ill. High Sch. Ass'n*, 2017 IL 121124, ¶ 30-31 (Ill. Sup. Ct. 2017).

IHSA also relies on *Hood v. Illinois High School Association*. Notably, IHSA argued in *Hood* that it **was** a "local public entity" for the purposes of tort immunity. *Hood v. Ill. High Sch.*

---

gate receipts. *Id*. at 30:20-31:16. IHSA downplays these financial relationships, *see* DSOF ¶ 30-31, while A.H. argues that they clearly are clear evidence of financial connections between the public schools and IHSA.

*Ass'n*, 359 Ill. App. 3d 1065, 1068, 835 N.E.2d 938, 940 (Ill. App. Ct. 2005). The court rejected that argument because the tort immunity statute applied only to not-for-profit *corporations* and the parties agreed IHSA was an unincorporated association. *Id*. at 942. The *Hood* court further reasoned that IHSA was a statewide organization, not a local one, and thus it would be inappropriate to apply a tort immunity statute intended for local government actors to IHSA. *Id*.

Far from there being no disputes of material fact and IHSA being entitled to summary judgment as a matter of law, the Court sees no compelling evidence to support the view that IHSA is not a public entity under Title II and to the extent such evidence exists there are disputes of material fact as to IHSA's financial relationship with public schools. Accordingly, summary judgment for IHSA is not warranted on this question.

IHSA next argues that it is not a state actor for the purposes of the Illinois and federal Equal Protection Clause claims. The analysis of both claims is identical, so the Court treats them as one. *Jarabe v. Industrial Comm'n (American Airlines)*, 666 N.E.2d 1, 3 (Ill. Sup. Ct. 1996). As noted above, the Seventh Circuit has already treated IHSA is a state actor. *Griffin High School*, 822 F.2d at 674; *Menora v. Illinois High School Asso.*, 683 F.2d 1030, 1032 (7th Cir. 1982). IHSA maintains that the Seventh Circuit's holding in *Griffin* "is of little value," Def.'s Mem. at 8-9, because the parties did not dispute whether the Indiana High School Athletic Association was a public entity. *Griffin* cannot be tossed aside that easily, however. While it is true that the parties did not dispute the issue in *Griffin*, the Court of Appeals did not pass over the question, but rather agreed that it was appropriately not in dispute because "the overwhelmingly public character of the IHSA membership is sufficient to confer state action for the purposes of § 1983." 822 F.2d at 674. The Seventh Circuit did not linger over the question, but that is because it did not find the issue to be a close one. In any event, this Court is not free to disregard

that assessment simply because the Court of Appeals did not consider the question at greater length.

IHSA seeks to trump *Griffin* by pointing the Court instead to *NCAA v. Tarkanian*, in which the Supreme Court found the NCAA was not acting as a state actor when it issued a report detailing rule violations at the University of Nevada, Las Vegas and pressured the school to fire its coach. 488 U.S. 179, 182 (1988). For several reasons, *Tarkanian* is inapposite in this case. Initially, the Supreme Court explained that the NCAA, as a national organization, could not be seen to speak for the state of Nevada in any meaningful way. *Id*. at 193. Of course, in this case IHSA could feasibly speak for the state of Illinois in high school athletics because it is exclusively an Illinois organization. Furthermore, the Court reasoned, the NCAA was in conflict with the interests of the University of Nevada (which would have liked to keep its coach) and so could not have been acting in the interests of the state. *Id*. at 196. Here, Illinois benefits from IHSA's statewide tournaments and is not in any way in conflict with IHSA's interests. In fact, the Court noted in *Tarkanian* that "[t]he situation would, of course, be different if the membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign" and cited to two appellate court opinions finding state high school athletic associations were state actors. *Id.* at 193 n.13.

More on point is *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). There, the Court instructed that state action is a "necessarily fact-bound inquiry" in which a court must look beyond the "nominally private character" of a group and focus on the "entwinement of public institutions and public officials in its composition and workings." *Id*. at 298. The facts of *Brentwood Academy* were nearly identical to the facts here. There, the Court was persuaded that an organization was a state actor where public schools

made up 84% of its members, principals assisted in the governance of the association, and it derived revenue from tournaments at member schools. *Id*. at 298-300. To be sure, there were also some facts not present here: Tennessee School Board members had a formal role and the association had sometime been designated by statute as the official regulator of interscholastic athletics (although it was not so designated at the time). *Id*. at 300-301.

As discussed above, 90% of Illinois high schools participate in IHSA events. PSOF ¶ 13. IHSA characterized its involvement with its member school as "supervis[ing] and regulat[ing] interscholastic activities of its member schools" and asserted it "governs the . . . participation in interscholastic athletics" for member schools' students. DSOF ¶¶ 2, 5. At least some IHSA events are held at public schools. *Id*. at ¶ 4. IHSA's Board is comprised of principals from member schools who attend board meeting during the day in the course of their employment. *Id*. at ¶ 10; Pl.'s Resp. to DSOF ¶ 32. It is funded by gate receipts, sponsorships, and "licensure fees from officials." DSOF ¶ 29. There is a factual dispute between the parties as to whether IHSA collects any fees from member schools.

*Griffin* is binding on IHSA's status as a state actor, and the facts adduced in this case provide no basis to question the validity of the Court of Appeals' conclusion. IHSA is a state actor by virtue of its entwinement with the public school system. Any student from a public high school who competes in the hopes of making it to "state" would understand that the IHSA and its tournaments are deeply interwoven with the public schools and their athletics programs. The Court therefore denies IHSA's motion for summary judgment on this basis as well.

### IV. Discrimination and Reasonable Accommodation

IHSA's third argument gets to the central issue in this case: did IHSA discriminate against A.H. in denying his requests for lower qualifying standards for the state finals and a

separate division for the Road Race? The parties agree that A.H.'s Rehabilitation Act, Title II, and Title III claims will all rise and fall under the same analysis. *See Radaszewski ex rel Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004). Discrimination under both the Rehabilitation Act and the ADA "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). These three forms of discrimination are independent causes of action. *Wisconsin Community Services v. City of Milwaukee,* 465 F.3d 737, 751 (7th Cir. 2006).

This is not an intentional discrimination case. The IHSA policies at issue—finals participants must meet qualifying standards and ambulatory Road Race runners compete together—are facially neutral. A facially neutral rule typically does not support a claim for intentional discrimination. *See Washington*, 181 F.3d at 848-849 (*citing McPherson v. Michigan High Sch. Ath. Ass'n,* 119 F.3d 453, 460 (6th Cir. 1997)). And here there is no evidence that IHSA intentionally discriminated on the basis of disability when it adopted facially neutral policies governing the qualifying times for state and the divisions of the Road Race. A.H. effectively concedes as much by arguing in his brief that no evidence of intentional discrimination is required to prove his claim. Certainly he points to none and, indeed, it is undisputed that IHSA provides accommodations of the sort A.H. seeks for disabled swimmers. *See* Reply at 10. No one has suggested that IHSA has a discriminatory preference for swimmers over runners.

Nor is this really a disparate impact case, notwithstanding the references to "disparate impact" in the complaint. *See, e.g.,* Compl. ¶ 58. Contesting disparate impact, IHSA argued in its

opening brief that "A.H. cannot establish that 'but for' his disability he would meet the qualifying standards for State, earn points for his team, or place / earn a medal in the Road Race," Mem. at 11, and A.H. responded by invoking reasonable accommodation principles, not disparate impact: "Plaintiff is not required to prove that IHSA designed the time standards with the intent of discriminating against para-ambulatory athletes with physical disabilities. ***Instead, Plaintiff must only show that the requested accommodations are reasonable***." Resp. at 10 (emphasis added). Nowhere does A.H. make any argument that there is evidence that, but for his disability, he would be able to qualify for the state finals or medal in the Road Race. To the contrary, he expressly disclaims making such an argument, contending that IHSA "misstates Plaintiff's position" when it posits that he cannot show that he could qualify for the finals or medal in the Road Race were he not disabled. Resp. at 11-12. His position, he says, is that IHSA's rules have deprived him of a "*meaningful opportunity"* to qualify. That is the language of reasonable accommodation, but it renders the but-for causation analysis no less relevant. That is because causation is a necessary component of both theories of discrimination.

In *Alexander v. Choate*, the Supreme Court confirmed that a disability discrimination claim under the Rehabilitation Act can be based on disparate impact, rather than on intentional discrimination, while also rejecting the premise that "all disparate-impact showings constitute prima facie cases" of discrimination. 469 U.S. 287, 299 (1985). The Court pointed to its opinion in *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), for the premise that the "disparate impacts § 504 might make actionable" are those in which a refusal to accommodate the needs of the disabled deprives them of "meaningful access to the benefit that the grantee offers." *Choate*, 469 U.S. at 301. In this way, the disparate impact analysis is bound up with the issue of reasonable accommodation.

More specifically, both disparate impact and reasonable accommodation require assessment of whether the alleged discrimination occurs "by reason of" the plaintiff's disability. "There must be a causal connection between the disability and . . . ineligibility." *Washington*, 181 F.3d at 848. This is "but-for" causation; "[t]he 'by reason of' language merely indicates that, but for his . . . disability, [the plaintiff] would have been eligible to play . . . ." *Id*. at 849. "[T]he ADA and the Rehabilitation Act are addressed to rules that hurt people with disabilities by reason of their handicap, rather than that hurt them solely by virtue of what they have in common with other people." *City of Milwaukee*, 465 F.3d at 748 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 26-79 (2d Cir. 2003)).

There is no question that A.H. does not presently have a "meaningful opportunity" to participate in the finals or medal in the Road Race. The record is clear and undisputed that his disability adversely affects his ability to compete with his able-bodied peers; due to his disability, he runs differently, and less efficiently, than they do. *See*, *e.g.,* PSOF ¶ 4-5. Even the world record holders in the adaptive sporting events and classification in which A.H. competes cannot qualify for the Illinois state high school track finals. But that it is "essentially impossible for Plaintiff to ever qualify under the able-bodied time standards," as A.H. contends, does not establish that those standards are the but-for cause of his failure to qualify for the finals. Causation does not turn on whether a disabled runner like A.H. has a realistic chance to qualify for the finals; it turns on whether A.H. would have a realistic shot at qualifying ***if he were not disabled***.

But IHSA's standards prevent not only para-ambulatory racers like A.H. from competing at the state finals, but 90% of the state's non-disabled high school runners as well. As such, those standards have no "particular exclusionary effect on the handicapped," *Choate*, 469 U.S. at 720;

they exclude the non-disabled with comparable ruthlessness. There is, then, no basis to infer simply from the fact that disabled runners have failed to qualify for the state finals that the failure is "by reason of" their disabilities; the odds are overwhelming that they would have failed to qualify even had they not been disabled. The but-for causation inquiry requires A.H. to adduce evidence sufficient to create a material dispute of fact as to whether but for his disability, he would be among the elite 10% of non-disabled runners who qualify for the state finals. To answer that question, there must be evidence from which a reasonable trier of fact could conclude that, were he not disabled, A.H. would be able to qualify for the finals or score points for his team in the Road Race.

On this record, there is no such evidence. While A.H. has introduced evidence that he is considered an "elite physically disabled athlete," PSOF ¶ 8, the evidence that A.H. can compete successfully against others in his IPC classification provides no basis to support an inference that he would enjoy similar success competing in the far deeper pool of able-bodied athletes. One cannot simply assume a correlation between elite athletic performance as a para-ambulatory runner afflicted with cerebral palsy and elite athletic performance generally; the comparative reference groups are grossly dissimilar. A.H., moreover, is not particularly close to the qualifying times for able-bodied athletes, so one cannot reasonably intuit that the degree of improvement needed is so modest that A.H. would likely be able to bridge the gap were he unencumbered by cerebral palsy. And while all acknowledge that A.H. has an intense work ethic and has been dogged in the pursuit of his goals, it is an unfortunate fact of athletic life (and life in general, for that matter) that hard work is no guarantee of competitive success; we all have varying degrees of athletic ability and few will rise to elite status even with a work ethic second to none. In short, A.H. has not provided an evidentiary basis to warrant a finding that he would be among the elite

but for his disability.[13] Absent such evidence, there is no basis to conclude reasonably that it is

A.H.'s disability, rather than IHSA's highly selective standard, that prevents A.H. from having a

meaningful chance to qualify for the finals or medal in the Road Race.[14]

Even if A.H. had presented evidence sufficient to support a finding that, but for his

disability, he could have qualified for the finals or medaled in the Road Race, his request that

---

[13] The Court intends no criticism in noting that A.H. has not presented evidence of causation; that fact may simply reflect the difficulty A.H. would face in adducing such evidence. Unlike some para-athletes who incurred disabilities later in life, A.H. has no record of performance as a non-disabled athlete to cite as evidence of his capabilities in the absence of disability; he has been disabled since birth. That is not, however, to say that a but-for showing could not have been made. There appears to be a relatively robust academic and clinical literature addressing the topic of predictors of athletic success (*see, e.g.,* Mark S. Allen Sylvain Laborde, *The Role of Personality in Sport and Physical Activity,* 23 CURRENT DIRECTIONS IN PSYCHOL. SCI. 460 (2014); Jia Han et al., *Level of Competitive Success Achieved by Elite Athletes and Multi-Joint Proproiceptive Ability,* 18 J. SCI. & MED. IN SPORT 77 (2015); Carl T.E. Woods et al, *Predicting Playing Status in Junior Australian Football Using Physical and Anthropometric Parameters*, 18 J. SCI. & MED IN SPORT 225 (2015); *but see* Dusan Ugarkovic et al, *Standard Anthropometric, Body Composition, and Strength Variables as Predictors of Jumping Performance in Elite Junior Athletes*, 16 J. STRENGTH & CONDITIONING RES. 227 (2002)) and there may be physiological and psychological metrics that correlate to athletic success but are independent, in whole or part, of the limitations imposed by cerebral palsy. Expert testimony could be used, as it was in *Washington*, to establish an individual's capacities independent of his or her disability. *See Washington*, 181 F.3d at 849 (testimony of school psychologist demonstrated plaintiff would be fully capable of performing absent disability). Here, A.H.'s expert testified as to how A.H.'s disability limits his capacity, but did not opine on what his athletic performance would be without that limitation.

[14] The parties also debate whether or not A.H. can participate in the Road Race at all because IHSA requires para-ambulatory and able-bodied athletes to run at the same time. *Compare* DSOF ¶ 75; Pl.'s Resp. to DSOF ¶ 75. Ms. Serota, A.H.'s expert, testified that the Road Race was unsafe because A.H.'s disability causes imbalance and the jostling at the starting line could cause him to lose his balance. *See* Serota Report ¶¶ 89, 132. A.H.'s own complaint takes a different view, however, stating that "A.H. is eligible and qualified to fully and safely participate in the track and field, Road Race, and cross country events conducted or overseen by IHSA, and other sports programs, with or without reasonable modifications and/or accommodations." Compl. ¶ 25. The Court notes as well that even if A.H. proves that IHSA's current design for the Road Race is unsafe, that would only merit relief solving the safety problem. Although implementing a separate division for para-ambulatory runners would be one solution, there are other solutions (such as adding lanes or allowing the para-ambulatory runners to start later and have their times modified accordingly) that might also be effective. Thus, to the extent that the issue is purely safety, that is an argument about the reasonableness of IHSA's accommodations, which are discussed below.

IHSA establish different (that is, lower) qualifying or medaling standards would not be a reasonable accommodation. Ordinarily, "[w]hether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). An accommodation is unreasonable, however, if it would fundamentally alter the nature of the program or create undue financial and administrative burdens. 28 C.F.R. § 35.130(b)(7); *Davis*, 442 U.S. at 410, 412; *United States v. N. Ill. Special Rec. Ass'n*, 168 F. Supp. 3d 1082, 1092 (N.D. Ill. 2016). IHSA does not meaningfully argue that the requested accommodations would create undue financial or administrative burdens.[15] It does argue, however, that granting A.H.'s requests would fundamentally alter the nature of its programs.

IHSA argues that A.H.'s time standards and new division requests would fundamentally alter its programs because "[l]owering the competitive standards would strip the State Tournament of its identity as the scarcest competitive opportunities [sic] in interscholastic high school athletics." Def.'s Mem. at 17. In other words, the events in question are championships and IHSA maintains that it would fundamentally alter the nature of the events to require it to lower the standards necessary to qualify for (in the case of the finals) or medal in (in the case of the Road Race) the events. A.H. protests that he does not seek to lower the qualifying standards but rather to create a separate division for para-ambulatory runners. That is a distinction without a difference; it is undisputed that the qualifying times that A.H. seeks for the finals would be

---

[15] IHSA has agreed that "[i]mplementing time standard accommodations for para-ambulatory athletes in swimming did not create any significant costs, logistical burdens, and unfair advantages over able-bodied swimmers." PSOF ¶ 23. The parties agree that costs would not be an impediment to A.H.'s request for separate qualifying times. *Id*. at ¶ 26. Plaintiff's expert, Keri Serota, further opined that allowing para-ambulatory students to earn points through their own qualifying times would be inexpensive. *Id*. at ¶ 37. Serota further opined that there would be "minimal cost and minimal logistical challenges associated with setting up a new division in the Road Race." Serota Report ¶ 135.

significantly lower than the qualifying times to which he is now subject. Plainly, implementing those new qualifying standards would "lower qualifying standards" for the state finals. Similarly, allowing competitors other than the top five finishers in the Road Race to medal would lower the standards by which the top performers in that race are determined.[16]

The Supreme Court has held in other contexts that "legitimate physical requirements" may be imposed without violating the ADA. *Davis*, 442 U.S. at 406. For example, in *Davis*, the Court found that a deaf nurse would be unable to perform some of the functions necessary for patient safety, and accommodations such as dispensing with the clinical component of the course of study were not reasonable because they would fundamentally alter the nature of the school's nursing program. *Id.* at 408-410. Relying on *Davis*, the Seventh Circuit held in *Brookhart v. Illinois State Board of Education* that the State Board of Education did not violate the Rehabilitation Act by withholding diplomas from mentally disabled students who had failed to pass a required "Minimum Competency Test" on the ground that altering the diploma standard for the mentally disabled would constitute a "substantial modification" of the Board's diploma requirements. 697 F.2d 179, 183-84 (7th Cir. 1983). Consistent with these precedents, courts of this district have construed *Davis* to mean that institutions need not lower their competitive standards for individuals with disabilities. *See Yates v. John Marshall Law Sch.*, No. 08 C 4127, 2009 WL 1309516, at *6 (N.D. Ill. May 11, 2009); *Herdman v. Univ. of Illinois*, No. 96 C 8025, 1998 WL 774684, at *7 (N.D. Ill. Oct. 28, 1998). Here, there is no escaping the fact that A.H.'s

---

[16] Creating a new division is even more problematic in IHSA's view. A new division would, it maintains, violate the ADA's integration mandate, which requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (1998). The "most integrated setting" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt 35, App. B.

request for different qualifying times is a request that IHSA lower the bar for admission to the state finals for people with disabilities.

Furthermore, the Supreme Court has outlined two scenarios in which an accommodation fundamentally alters the nature of a sporting event: when the accommodation changes an "essential aspect of the game" and when an accommodation gives a disabled player an advantage that "fundamentally alter[s] the character of the competition." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682-83 (2001). For example, allowing a wheelchair racquetball player two bounces instead of one before returning the ball would alter nature of racquetball. *Kuketz v. Petronelli,* 821 N.E.2d 473, 478 (Mass. Sup. Ct. 2005). In *Martin*, the Supreme Court found that "[f]rom early on, the essence of the game [of golf] has been shot-making;" accordingly, it held that allowing a competitor to use a cart between shots did not alter the essential nature of the game. *Martin*, 532 U.S. at 683. Running a designated course and distance in the shortest period of time is, of course, the essential nature of a track or road race. And more to the point here, the standards that A.H. seeks to modify are the standards used to recognize the most accomplished racers; rewarding a slower runner would, of course, be antithetical to the nature of a footrace. IHSA is not required by the ADA to alter this essential aspect of racing to accommodate those who have disabilities that affect their ability to race fast enough to be competitive. By lowering the skill level required to compete for victory and recognition in the IHSA's track events, the requested accommodations would, indisputably, "fundamentally alter the character" of the IHSA's competition and would, in that sense, convey an unfair competitive advantage.[17]

---

[17] IHSA further argues that it is barred from creating separate activities for para-ambulatory students by the applicable regulations, 34 C.F.R. § 104.37(c) and 34 C.F.R. §104.34(b). These regulations actually appear to contemplate circumstances in which it would be *permissible* to create a separate program (as long as no student is prevented from joining a mainstream team and doing so would be "appropriate to the needs of the handicapped person in

*Martin* illustrates the difference between an accommodation reasonably necessary to allow participation in an elite athletic event and one that is not required because it changes the competitive nature of the event. *Martin* was permitted to use a golf cart, the Supreme Court held, because that accommodation to his disability did not confer a competitive advantage on him. But there was no suggestion in *Martin* that the defendant was required to weight Martin's score differently to make up for any difficulties his disability imposed. To the contrary, the Court emphasized that the point of the reasonable accommodation requirement was to facilitate "the chance to qualify for, and compete in, the athletic events [offered] to those members of the public ***who have the skill*** and desire to enter." 532 U.S. at 690 (emphasis added). Martin had the skill to compete against non-disabled golfers without any accommodation; the Court regarded that skill as a prerequisite to Martin's need for an accommodation. A.H., however, readily concedes that he does not have the ability to compete with runners who are not disabled; he seeks an accommodation to make him competitive given his relative lack of ability.

That request is inconsistent with the Supreme Court's teaching in *Martin* and A.H. has identified no authority that requires IHSA to provide disabled athletes an equivalent opportunity for athletic success by lower qualifying standards for participation or medaling in championship events. IHSA provides the same opportunities to compete in the finals and the Road Race to

---

question"). *Id. Compare Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) (employer not required to create new job for disabled employee). This possibility is also referenced by the Dear Colleague letter relied on by IHSA. *See* Office of Civil Rights, *Dear Colleague Letter* (Jan. 25, 2013), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201301-504.html#note20 (simultaneously stating that the "provision of unnecessarily separate or different services is discriminatory" and that "[w]hen the interests and abilities of some students with disabilities cannot be as fully and effectively met by the school district's existing extracurricular athletic program, the school district should create additional opportunities for those students with disabilities"). This guidance suggests that while it would be permissible for IHSA to create separate programs or races for para-ambulatory athletes, there is no requirement to do so where the competitive nature of the program requires selectivity (as the state finals do here).

disabled runners that it provides to the non-disabled, but A.H. seeks more, namely the same opportunity to be competitive. But the anti-discrimination statutes require equality of opportunity and access, not of results. In *Choate*, the Supreme Court rejected the proposition that the state's reduction in the maximum hospital stay reimbursable by Medicaid discriminated against the disabled (who required a disproportionately high percentage of hospital stays in excess of the new cap), holding that the Rehabilitation Act "does not . . . guarantee the handicapped equal results from the provision of state" programs. 469 U.S. at 304. Consistent with that view, in *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 560 (7th Cir. 1999), the Seventh Circuit expressly held that the ADA does not require alterations to goods and services to make them as valuable to the disabled as they are to the non-disabled. But that is what A.H. seeks: modifications that will provide him with a competitive experience that rivals that of non-disabled competitors. Just as a state "is not required to assure that its handicapped Medicaid users will be as healthy as its nonhandicapped users," *Choate,* 469 U.S. at 305-06, IHSA has no obligation to modify its products—the competitions it sponsors—to assure that disabled student athletes will be as competitive as non-disabled student athletes.

Though the burdens of requiring organizations like IHSA to tailor competitive experiences to the unique needs of disabled athletes could be huge, IHSA has essentially conceded that A.H.'s requested accommodations would pose little administrative, logistical, or financial burden. A.H. argues that the accommodations he requests are reasonable because IHSA already makes similar accommodations for disabled wheelchair racers, female runners, and on the basis of distinctions based on school geographic considerations and size of enrollment. While the IHSA's creation of certain competitive divisions demonstrates the feasibility of at least some differentiation, it does not show that the competitive standards the IHSA has adopted with

respect to those divisions discriminate against the disabled. Because IHSA's standards are facially neutral and have not been shown to cause any discriminatory effect on A.H. (or others), the Court agrees that IHSA is not required to accommodate A.H.'s requests. The IHSA provides the same opportunity to qualify for the finals, and to medal in the Road Race, to A.H. and other disabled runners that it provides to runners who do not suffer from physical disabilities. As such, A.H. has a "meaningful opportunity" to participate in these events and no further accommodation is required under the Rehabilitation Act or the ADA.

There is one aspect of A.H.'s failure to accommodate claim that requires separate consideration, however: his ability to compete safely in the Road Race. IHSA may have failed to accommodate A.H. given the safety concerns raised by A.H.'s lawyers and expert regarding the Road Race. *See* Resp. at 13 ("Plaintiff's request for a separate division for para-ambulatory athletes with disabilities were [sic] based on certain safety concerns"); Serota Report ¶ 132 ("IHSA's decision to start non-wheelchair athletes with physical disabilities and able-bodied athletes together in the Road Race creates safety concerns"). Based on A.H.'s expert's report, it appears that the Road Race as currently constituted prevents A.H. and other para-ambulatory runners from participating. *See* Serota Report at ¶ 132. In contrast to A.H.'s request for separate scoring and medaling opportunities for para-ambulatory runners, this request does not implicate the nature of the competition during the race. Allowing runners to start at different times or in separate lanes would not change the essential nature of the race but could facilitate participation by para-ambulatory runners who might otherwise decline to race based on concerns about their safety, particularly at the start of the crowded start of the race. The parties do not address whether creating a safe environment would require an entirely new "division" or something less. Whether a separate division is a reasonable request to solve this problem was not addressed by

the parties, so the Court cannot determine on this record whether a lesser accommodation that addresses that problem is feasible. The Court therefore denies IHSA's motion for summary judgment on the Road Race failure to accommodate claim to the extent that the accommodation sought relates to measures necessary to allow him to participate in the event safely.

### V. Rational Basis

A.H. also contends that in failing to provide lower qualifying standards, IHSA violates his right to equal protection. That argument fails right out of the box: To prove an equal-protection claim, a plaintiff must show that the state action had a discriminatory effect and that the defendant was motivated by a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")). *See also, e.g., Bennett v. Roberts*, 295 F.3d 687, 699 (7th Cir. 2002); *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993); *Minority Police Officers Ass'n v. City of South Bend,* 801 F.2d 964, 966 (7th Cir. 1986). As has already been discussed, A.H. has adduced no evidence that, in setting its qualifying standards for the state finals and medal opportunities in the Road Race, IHSA has been motivated by any animus toward those with disabilities. To the contrary, the record reflects that where it has deemed it appropriate to do so, IHSA has voluntarily provided unique opportunities for disabled student athletes, such as creating a division in which wheelchair racers may compete. A.H. has identified no provision of law that requires IHSA to do the same for all students with disabilities that impair their abilities to compete in athletics.

A.H.'s equal protection claim fails in any event because IHSA had a rational basis for its decision. As the parties agree, disabled individuals are not a suspect class entitled to heightened

scrutiny on their Equal Protection Clause claims. *See Doe v. Bd. of Trs. of the Univ. of Ill.*, 429 F. Supp. 2d 930, 939 (N.D. Ill. 2006); *United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999); *cf. City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 446 (1985) (government regulation of the mentally disabled subject to rational basis review).[18] Furthermore, participation in athletics is not a fundamental constitutional right. *See Todd v. Rush County Sch.*, 133 F.3d 984, 986 (7th Cir. 1998). Thus, although disabled individuals receive broader protection under the ADA, the relevant standard of review for a constitutional claim is rational basis review. *Stevens v. Illinois DOT*, 210 F.3d 732, 738 (7th Cir. 2000).

There is a rational basis for an action if there is "any reasonably conceivable state of facts that could provide a rational basis." *Srail v. Vill. of Lisle*, 588 F.3d 940, 946 (7th Cir. 2009). "The Supreme Court has made it clear that under rational-basis review, the challenger must 'negative every conceivable basis' that might support the challenged law, and 'it is entirely irrelevant . . . whether the conceived reason for the challenged distinction actually motivated the [policy maker]." *Monarch Beverage Co., Inc. v. Cook*, --- F.3d ---, 2017 WL 2821877, *2 (7th Cir. June 30, 2017) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993)). "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Srail*, 588 F.3d at 946. "A rational basis 'may be based on rational speculation unsupported by evidence or empirical data.'" *Id*. at 947 (quoting *Beach Commc'ns,* 508 U.S. at 315).

IHSA argues that it had a rational basis for its decisions because A.H.'s requested accommodations were unreasonable. As to the qualifying times request, IHSA has presented

---

[18] IHSA also argued that A.H. had failed to establish a "class of one" theory. A.H.'s response clarifies, as this Court had previously held, that A.H. is not pursuing a "class of one" theory. *See* Pl.'s Resp. at 26.

seemingly rational reasons for its actions – its desire to provide an integrated environment and not alter the essential nature of the competition. A.H. essentially argues that this is a pretext, as revealed by IHSA's adoption of a wheelchair division for both events. To the extent that A.H. contends para-ambulatory athletes should be given a different division of the Road Race because wheelchair users have such a division, that argument fails the rational basis test. Wheelchair users are engaged in a fundamentally different activity (wheeling versus running) and it is rational for IHSA to provide them with a separate competition. Relatedly, the fact that IHSA permits para-ambulatory swimmers to compete in a disabled students division (along with wheelchair swimmers) does not, as A.H. contends, show its decision to integrate para-ambulatory runners with abled-bodied runners to be irrational. Ambulatory but disabled swimmers and non-ambulatory swimmers can compete together (swimming, of course, does not require ambulation and there is no need for a wheelchair) and it is perfectly rational to have them do so; the distinctions between their disabilities do not affect their ability to compete against each other (at least there is no evidence of record to show that they do, and any differences would pale in comparison to the differences between them and non-disabled swimmers). But as noted above with respect to participation in a track event, like the Road Race or the state finals, it is rational to integrate para-ambulatory runners with non-disabled runners rather than with wheelchair racers because those events (running versus wheeling) are fundamentally different in nature.[19] In a track competition, it is hardly irrational to group those who can run separately from those who cannot.

*       *       *

---

[19] While A.H. makes much of the medical evidence that he physically runs differently due to his disability, the Court does not believe his evidence suggests he is engaged in an activity other than running.

Where all this leaves us is that, for the most part, A.H.'s claims cannot succeed as a matter of law. IHSA is not required, by statute or the Constitution, to lower the qualifying standards for the athletic competitions it sponsors (the accommodation A.H. seeks regarding the finals) or to create alternative athletic competitions (the opportunity to medal in a separate division in the Road Race). Therefore, the Court cannot compel IHSA to make those accommodations for A.H. and IHSA is entitled to judgment in its favor (with the limited safety exception noted). Nevertheless, the Court adds its voice to those of A.H., his parents, his coaches, and his fellow athletes and schoolmates (both disabled and non-disabled) in urging the IHSA to reconsider its evaluation of A.H.'s requests. Although those requests will indeed alter the competitive character of the events in some sense, they will surely enhance and enrich the experience of the participating student athletes in other respects. As the IHSA has already recognized in some other contexts, enabling the full participation of disabled athletes alongside (as closely as possible) their able-bodied peers, and factoring their performances into the successes and failures of their school teams, will devalue the meaning of "state champion" for no one. Rather, it will provide still more examples of determination, discipline, and perseverance from which we may all take inspiration for our own endeavors. A.H.'s participation in the state finals won't diminish anyone else's success, or highlight anyone else's failure. It will simply give us all another reason to cheer.

For the reasons set forth above, the motion to bar the testimony of Keri Serota is granted in part and denied in part. The motion for summary judgment is denied in part and granted in part.

Dated: July 7, 2017

John J. Tharp, Jr.
United States District Judge